# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY G.

          **Claimant,**

    **v.**

**ANDREW SAUL, Commissioner of
Social Security,**

          **Defendant.**

No. 17 CV 4393

Jeffrey T. Gilbert
Magistrate Judge

## MEMORANDUM OPINION AND ORDER

Claimant Anthony G.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul, Commissioner of Social Security ("Commissioner"),[2] denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 30]. The parties have filed cross-motions for summary judgment [ECF Nos. 9, 21] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Acting Commissioner of Social Security Andrew Saul as the named defendant.

below, Claimant's Motion for Summary Judgment [ECF No. 9] is denied and the Commissioner's Motion for Summary Judgment [ECF No. 21] is granted.

## PROCEDURAL HISTORY

On September 13, 2013,[3] Claimant filed a Title XVI application for SSI benefits, as well as a Title II application for a period of disability and disability insurance benefits. (R. 246-49). The claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 132-33, 176-77). On May 14, 2015, Claimant appeared and testified at a hearing before ALJ Daniel Dadabo. (R. 68-111). The ALJ also heard testimony on that date from vocational expert ("VE") Craig Johnston. (R. 68-111). Claimant had a second hearing before the ALJ on May 3, 2016, at which he again testified. (R. 39-68). Independent medical expert Dr. Sai R. Nimmagadda M.D., as well as VE Linda M. Gels, also testified on that date in order to provide the ALJ with additional input on Claimant's medical history, diagnoses, and treatment. (R. 39-68).

On June 2, 2016, the ALJ denied Claimant's claims for SIB and SSI after considering his limitations. (R. 17-33). In finding Claimant not disabled, the ALJ's opinion followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the date of his alleged disability onset, January 1, 2012. (R. 19). While Claimant was found to have engaged in some "light and semi-skilled" work after his alleged disability onset date, the ALJ concluded that this work was clearly not substantial or gainful. (R.

---

[3] The ALJ noted that Claimant filed his Title II and Title XVI applications on August 20, 2013. (R. 17). While the state disability determination service's denials indicate Claimant filed his application on August 20, 2013 (R. 132-33, 160-61), correspondence from the Social Security Administration itself shows that Claimant applied on or about September 13, 2013. (R. 246-59). Although not a material discrepancy, the record should reflect the correct date of Claimant's application appears to be September 13, 2013.

19). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 20). Those impairments included depression, anxiety, mild obesity, lumbar and thoracic degenerative disc disease with status post two lumbar laminectomy procedures, hypertension, and stage III kidney disease. (R. 20).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 25-26). Specifically, the ALJ noted that with respect to Claimant's degenerative disc disease of his lumbar spine, Claimant did have positive EMG/NCV findings and some noted gait disturbances. (R. 20). However, there was no evidence of muscle denervation, atrophy, weakness, or gross motor disturbance, nor was Claimant able to establish that he could not ambulate effectively under the criteria of Listing 1.04. (R. 20). Dr. Nimmagadda, who testified at Claimant's second hearing, testified consistent with the ALJ's findings that Claimant did not establish a listing-level impairment. (R. 20).

The ALJ further found at step three that Claimant's history of stage III kidney disease did not meet or medically equal the criteria of Listing 6.0, as Claimant's laboratory testing did not approach listing-level and Claimant did not possess any other comorbid complications required by Listing 6.05. (R. 21). Nor did Claimant's mental impairments, either singly or in combination, meet or medically equal the criteria of listings 12.04 and 12.06, according to the ALJ. (R. 21). The mental impairments, the ALJ explained, did result in mild limitations on Claimant's ability to care for the activities of daily living and moderate limitations on his ability to function socially and to maintain concentration, persistence, or pace. (R. 21). Claimant did not, however, experience any episodes of decompensation of extended duration. (R. 21). The ALJ therefore concluded that

Claimant's mental impairments did not cause at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. (R. 21). The "paragraph B" criteria, in the ALJ's opinion, were therefore not satisfied. (R. 21). The ALJ also determined that Claimant had not established the "paragraph C" criteria, as there was "no indication in the record of a chronic organic mental disorder or affective disorder of at least two years duration resulting in repeated episodes of decompensation, a residual disease process such that minimal increase in mental demands would result in decompensation, or a one year history of inability to function outside a highly supportive living arrangement." (R. 21).

The ALJ then found Claimant had the residual functional capacity[4] ("RFC") to:

> "stand/walk two hours in an eight-hour day, sit for six hours in an eight-hour day; lift/carry 20 pounds occasionally, 10 pounds frequently; can never climb ladders, ropes or scaffolding; occasionally climb ramps/stairs; occasionally stoop, crouch, crawl, kneel, and balance; cannot tolerate exposure to unprotected heights, heavy equipment, or operating machinery, cannot tolerate excessive vibrations; must be permitted to use a cane; and needs to stand for five minutes at the work station every 60-90 minutes. The claimant can perform work that requires only simple decision making, no public contact, and no more than occasional interaction with co-workers and supervisors." (R. 22).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a Mixing Machine Operator or Compounder, a Warehouse Laborer, and a Hand Packager. (R. 31). However, because Claimant's residual functional capacity limited him to less than light work, the ALJ found Claimant could not return to his past work. (R. 31). Finally, at step five, the ALJ concluded that Claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, including as a small products assembler, parts sorter, or surveillance monitor. (R. 32). The ALJ acknowledged that Claimant had additional limitations that impaired his ability to perform the full range of light work but concluded that

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

Claimant would nevertheless be able to transition to work that exists in significant numbers in the national economy consistent with his residual functional capacity and the VE's recommendation. (R. 32-33).

For the above reasons, at step five, the ALJ found Claimant was not disabled under the Act. (R. 32-33). The Appeals Council declined to review the matter on April 10, 2017 (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal

quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or

adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th

Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical

review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534

F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however,

"displace the ALJ's judgment by reconsidering facts or evidence, or by making independent

credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

Claimant argues five points on appeal. First, he contends that the ALJ erred by failing to

find that Claimant's degenerative disc disease did not meet or equal Listing 1.04. Second, Claimant

argues that the ALJ's assessment of opinion evidence was "confusing" and "does not comport with

regulatory guidelines." Claimant further argues that the ALJ improperly concluded that Claimant's

allegations were not consistent with the evidence in the record, and that the RFC failed to account

for all of Claimant's limitations, specifically those in concentration, persistence, or pace. Finally,

Claimant challenges the ALJ's conclusion that Claimant can perform "other" available work is

"premised on a flawed evaluation of vocational testimony." Plaintiff's Motion for Summary

Judgment [ECF No. 9] at 8.

### I. The ALJ Did Not Err in Concluding That Claimant's Degenerative Disc Disease Failed to Satisfy the Criteria of Listing 1.04

At step three, the ALJ determined that Claimant's degenerative disc disease did not meet

or functionally equal Listing 1.04. Claimant now argues that the ALJ erred in concluding that his

degenerative disc disease of the lumbar spine did not result in objective examination findings

sufficient to satisfy the criteria of Listing 1.04, and specifically, that he failed to account for

evidence in the record that showed he suffered from denervation, atrophy, weakness, and gross

motor disturbance. However, because the ALJ properly weighed the evidence in the record and provided an "accurate and logical bridge" to his conclusion that Claimant's degenerative disc disease did not satisfy the criteria of Listing 1.04, the Court upholds the ALJ's decision.

It is Claimant's burden to prove his medical condition met or equaled a listing. *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir.2006). If a claimant has an impairment that meets or equals an impairment found in the Listing of Impairments, a claimant is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d); *see also, Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett,* 381 F.3d at 668. While the listings "specify the criteria for impairments that are considered presumptively disabling…[a] claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing." *Id.* (citing 20 C.F.R. § 404.1525(a), § 404.1526(a)). A finding that a claimant's symptoms are medically equivalent requires an expert's opinion on the issue. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

Listing 1.04 describes spinal disorders, including degenerative disc disease, that result in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04; *see also, Minnick,* 775 F.3d at 935. The listing also requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." *Id.*

In reviewing the ALJ's conclusion that Claimant's degenerative disc disease of the lumbar spine did not result in "objective examination findings sufficient to satisfy the criteria of Section 1.04," the Court's task is not to reweigh the evidence or substitute its judgment for that of the ALJ's. (R. 20); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Nor is it to "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Rather, the reviewing court must determine whether the ALJ provided an "'accurate and logical bridge' between the evidence and the conclusion, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The Court, therefore, takes a very limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). If reasonable minds can differ over whether the applicant is disabled, the Court must uphold the decision under review. *Shideler,* 688 F.3d at 310.

The ALJ concluded Claimant did not meet the criteria of Listing 1.04 after reviewing the entirety of the medical record and relying particularly on the testimony of Dr. Nimmagadda, an independent medical expert, who dissected Claimant's medical findings and opined that they did not rise to the level of a Listing 1.04 impairment. (R. 20, 52-53). The ALJ assigned Dr. Nimmagadda's opinion substantial weight and relied on it in concluding that Claimant did not meet or equal an impairment listed in 1.04. (R. 20, 28). As Dr. Nimmagadda explained during questioning from the ALJ, Claimant lacked many of the criteria of Listing 1.04:

> "1.04, is there evidence of nerve root compression characterized by the distribution of pain, but he has to have loss of motor, atrophy associated with muscle weakness, accompanied by sensory or reflex loss and a positive SLR. But, you also have to have hernia nucleus pulposus and compromising nerve roots, and also having central canal stenosis. And the claimant here, while having a positive EMG, there were no active evidence of denervation.

So he has nerve root irritation, but the consequences of the muscle loss and denervation, reflexes et cetera are not present here." (R. 53).

The ALJ subsequently asked Dr. Nimmagadda pointed questions about Listing 1.04 to assess whether Claimant met the listing criteria. (R. 53). In response to the ALJ, Dr. Nimmagadda confirmed that, in his opinion, Claimant did not have active denervation, muscle weakness, atrophy, or any diagnostic evidence of motor impairment that would be required to meet the requirements of Listing 1.04. (R. 53).

Although Claimant asserts that the ALJ "ignored objective medical findings" in making his listing determination, in fact, the opposite is true. Both Dr. Nimmagadda and the ALJ took care to acknowledge Claimant had some limitations as a result of his degenerative disc disease. They simply disagree with Claimant that those limitations rise to a listing level impairment: a disagreement for which the ALJ cited evidentiary support from the record and provided an accurate, logical bridge to his conclusion.

Indeed, the ALJ specifically considered the very evidence Claimant emphasizes compels the opposite conclusion, namely Claimant's repeated "complain[ts] of nerve damage in the legs and feet from his history of back surgeries, with symptoms including tingling, burning, and pain," reports of "back surgery with no relief from numbness and pain in the feet and legs," and a "neurological exam [that] was positive for diminished strength in the lower extremities and diminished sensation to pinprick in the left lateral thigh, and positive findings on the Romberg test." Plaintiff's Motion for Summary Judgment [ECF No. 9] at 10; (R. 22-24). Dr. Nimmagadda, upon whose opinion the ALJ relied, acknowledged that Claimant was experiencing some pain as a result of nerve root compression. (R. 53). Despite documented pain and Claimant's "noted gait disturbances," however, the ALJ concluded that Claimant's medical records did not reveal any evidence of muscle denervation, atrophy, weakness, gross motor disturbance (not just gait

irregularities), or symptoms equal in severity to those described in Listing 1.04. Nor has Claimant

pointed to specific evidence, beyond his own testimony, to support such a finding. While Claimant

argues that the medical record is "filled with references to denervation, atrophy, weakness, and

gross motor disturbance," he cites only examples in the record of his own complaints of these

symptoms without support from objective medical evidence. Plaintiff's Motion for Summary

Judgment [ECF No. 9] at 9-10. As discussed below, the ALJ took these subjective symptom

complaints into consideration in formulating Claimant's RFC.

In sum, while the ALJ, as well as Dr. Nimmagadda, acknowledged Claimant was

experiencing "major physical impairments" that would have to be taken into account in the residual

functional capacity assessment, (R. 28-30, 49-50), these impairments did not meet the severity of

Listing 1.04, in the ALJ's opinion. The ALJ adequately explained his reasoning for coming to this

conclusion – an analysis which was not the type of perfunctory or inadequate explanation for which

courts ordinarily remand at step three. *See, e.g., Minnick,* 775 F.3d at 935; *Kastner v. Astrue*, 697

F.3d 642, 647–48 (7th Cir. 2012); *Barnett*, 381 F.3d at 670. The Court therefore finds based on

this record that the ALJ did not err in concluding that Claimant's degenerative disc disease failed

to satisfy the criteria of Listing 1.04.

## II.     The ALJ Properly Weighed Dr. Lang's Opinion and Other Opinion Evidence

Claimant next contends that the ALJ did not properly weigh the opinion of his treating

physician, Dr. Gordon Lang, M.D., when he afforded Dr. Lang's opinion minimal weight and

relied more heavily on the testimony and evidence provided by other medical experts such as Dr.

Nimmagadda. The treating physician rule[5] provides that the ALJ must give controlling weight to

---

[5] The Social Security Administration recently adopted new rules for agency review of disability claims involving the treating physician rule. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). Because these new rules apply only to disability applications filed on or after March 27, 2017 and Claimant filed his application on September 13, 2013, they are not applicable in this case. *See id.*

a treating physician's opinion if it is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence of record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ "may discount a treating physician's medical opinion if it is inconsistent" with the opinion of a consulting physician. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). If the ALJ denies a treating physician's opinion controlling weight, however, he still may afford it less evidentiary weight. "Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(I)-(ii), whether the physician supported his or her opinions with sufficient explanations, *see id.* § 404.1527(d)(3), and whether the physician specializes in the medical conditions at issue, *see id.* § 404.1527(d)(5)." *Elder,* 529 F. 3d at 415. As long as the ALJ considered these factors and "minimally articulated" his reasons for discounting the treating physician's opinion, his decision will stand. *Id.* (citing *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart,* 384 F.3d 363, 372 (7th Cir. 2004)).

Contrary to Claimant's characterization of the ALJ's opinion as "confusing," the ALJ explained at length and in detail his reasons for discounting Dr. Lang's opinion and affording it minimal weight. He specifically conducted a fulsome analysis of the factors articulated above by the Seventh Circuit before ultimately coming to the conclusion that Dr. Lang's opinion was neither well supported by medical findings, nor consistent with other substantial evidence of record. (R. 23-28); *see generally, Elder,* 529 F.3d 408 at 415. As for the first and second factors – the length, nature, and extent of Dr. Lang's and Claimant's treatment relationship – the ALJ concluded that while Claimant technically had seen Dr. Lang over the course of two and a half years, there appeared to be no more than four visits between the two of them, notwithstanding the fact that Dr. Lang claimed to have seen Claimant once a month. (R. 25, 496). Dr. Lang had not performed a

complete physical examination of Claimant since January of 2014, and according to the ALJ's review of the medical records, Dr. Lang performed only cursory examinations of Claimant in 2015 and 2016. (R. 25).

Claimant does not dispute these underlying facts; merely the ALJ's conclusion that the length, nature, and extent of Claimant and Dr. Lang's relationship is defined by more than simply the number of years they have known each other in a patient-physician context. Plaintiff's Motion for Summary Judgment [ECF No. 9] at 11 ("[The ALJ] also noted, quite puzzlingly, that seeing Plaintiff once a year does not give that doctor treating physician status, despite the long term relationship."). This Court finds that, although Claimant may disagree with the conclusion, the ALJ properly considered the first and second factors and sufficiently articulated his reasons for concluding they did not merit giving controlling weight to Dr. Lang's opinion. Furthermore, Claimant's argument that the ALJ stripped Dr. Lang of his status as Claimant's treating physician is unsupported by the record. In the Court's view, the ALJ acknowledged that Dr. Lang treated Claimant but discounted his opinion based on the limited interactions Dr. Lang had with Claimant, inconsistencies he noted both in Dr. Lang's opinion itself and with objective medical evidence in the record, and the fact that Dr. Lang's specialty was not closely aligned with Claimant's medical complaints, as discussed in more detail below. For these reasons, the Court is not persuaded that the ALJ removed, in some way, Dr. Lang's "treating physician status." Plaintiff's Motion for Summary Judgment [ECF No. 9] at 11. Rather, consistent with the Seventh Circuit's precedent in *Elder* and *Skarbek*, the ALJ afforded Dr. Lang's opinion less than controlling weight.

As for the extent to which the medical evidence supported Dr. Lang's opinion, the ALJ described, in great medical detail, the inconsistencies he perceived between Dr. Lang's opinion and Claimant's medical findings. (R. 25-27). For example, Dr. Lang opined, in part based on

Claimant's EMG/NCV findings, that Claimant could not, for example, walk one city block or more without rest or severe pain, would need to take unscheduled breaks of up to 30 to 45 minutes every hour during an 8-hour work day, during which he would need to lie down or sit quietly, and that Claimant would be absent from work and/or unable to complete an 8-hour work day 5 days or more out of the month. (R. 499). Yet the ALJ noted that the EMG/NCV did not document any active nerve denervation, sacral plexopathy, focal left peroneal or bilateral tibial neuropathies in the knee or ankle segments, lateral plantar neuropathies in the ankle or foot, myopathy, and it only showed the possibility of chronic L3-L4 radiculopathy. (R. 25). In the ALJ's opinion, the fact that focal signs were neurologically absent from the AMG/NCV was inconsistent with Dr. Lang's finding that Claimant was significantly limited by his medical condition from performing work or other daily functions. (R. 25, 496-99). The ALJ further noted that Dr. Lang's opinion conflicted with that of Dr. Daniel Casscioppo, M.D., a neurologist who recommended only conservative care for Claimant and documented that although Claimant appeared to have a progressive idiopathic polyneuropathy and chromic lumbar radiculopathy (at least, pending an updated MRI to make a fully assessment), Claimant was able to walk and stand normally, albeit with a limp. (R. 25).

The ALJ next addressed whether Dr. Lang's opinion was consistent with the general record and concluded that it was not. (R. 26-27). In articulating his reasons for this conclusion, *see, e.g, Elder,* 529 F. 3d at 415, the ALJ cited evidence in the record from Claimant's own hearing testimony, Dr. Lang's testimony and records, a foot and ankle specialist, Gene Choi, M.D., and two consultative examiners, internist Roopa Karri, M.D., and orthopedic James Elmes, M.D. (R. 26-27). In each instance, the ALJ concluded that Dr. Lang's opinion contradicted, or at the very least was inconsistent with, the record from each of those sources.

For example, in February of 2016, Dr. Lang noted Claimant had normal neurological findings and declined Claimant's request for an immediate orthopedic referral, which appeared to be inconsistent with the extreme limitations Dr. Lang concluded were necessary to accommodate Claimant's ongoing medical needs in April of 2015. (R. 26). Although Claimant testified at the hearing that he was experiencing incontinence, loss of bowel function, and constant, severe back pain – findings with which Dr. Lang concurred – Claimant told emergency room doctors only seven months after the hearing that he was, in essence, not experiencing the symptoms he previously described to the ALJ. (R. 530-33). Rather, he presented to the emergency room with low back pain that he stated occurred "after standing up" and that had been ongoing for about "two hours." (R. 532). The ALJ concluded that this evidence in the record was not consistent with Dr. Lang's opinion, nor was it internally consistent, i.e. Claimant's testimony at the hearing differed from what he told medical providers. (R. 26-27). Finally, the ALJ compared evidence in the record from Dr. Choi, Dr. Karri, and Dr. Elmes to Dr. Lang's opinion and concluded that Dr. Lang's opinion was inconsistent with each; for example, Dr. Elmes concluded that Claimant did not need a cane to ambulate and that Claimant could sit up to five hours, stand up to two hours, and walk one hour total in an eight hour day, so long as he was permitted to alternate between sitting and standing or walking every five to twenty minutes. (R. 26-27, 507-08). Dr. Lang, on the other hand, opined that Claimant could not ambulate without a cane on any surface and that Claimant would need to lie down and/or recline for about four out of the eight hours during the work day. (R. 497-98).

The final two factors the ALJ weighed were Dr. Lang's area of medical expertise and whether there were any other factors that validated or contradicted Dr. Lang's opinion. The ALJ noted that Dr. Lang specializes in nephrology, which is "not the specialty closely associated with

the claimant's primary impairment, which appears to be sensory neuropathy involving the lower extremities." (R. 28). The ALJ also concluded that some of Dr. Lang's medical conclusions were internally inconsistent and cited specific examples to that effect, including that Dr. Lang opined that Claimant could only stand or walk for 10 to 15 minutes at a time and would need to lie down for up to four out of the eight hours in a work day. This was, in the ALJ's opinion, mathematically inconsistent with Dr. Lang's simultaneous conclusion that Claimant could stand or walk for three out of the eight hours in a work day, and could sit up to four hours. (R. 28, 497-98).

As a result of all the factors he considered, the ALJ assigned Dr. Lang's opinion very little weight and concluded that the evidence implying a sedentary level restriction, not the more intense set of restrictions Dr. Lang propounded. In the Court's view, the ALJ's thorough analysis of the above factors satisfies the standard of having "minimally articulated" his reasons for discounting the treating physician's opinion, and therefore, his decision will stand. *Id.* (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir. 2004)).

As a final note, on several occasions, Claimant suggests that matters of semantics should be of great significance to the Court in evaluating whether the ALJ properly discounted Dr. Lang's opinion. For example, Claimant argues that the ALJ's use of different words to describe the standard with which he would regard Dr. Lang's opinion is important; specifically, that the ALJ stated he would afford Dr. Lang's opinion "minimal weight" and, in another instance, characterized it as "very little weight." Plaintiff's Motion for Summary Judgment [ECF No. 9] at 11. These arguments are unavailing. The ALJ properly weighed the above factors and articulated his reasons for discounting Dr. Lang's opinion as Claimant's treating physician in detail, just as he did with his reasons for affording Dr. Nimmagadda and the state agency consultant assessments substantial weight in developing Claimant's RFC. (R. 28-29).

Given the level of detail with which the ALJ expressed his assignment of weight to the various medical opinions and source material, Claimant's argument can, in fact, be distilled to the following: he believes the ALJ should have weighed the evidence differently than he did. Yet this fundamentally misunderstands the Court's role here, which is not to reweigh the evidence or substitute its judgment for the ALJ's with respect to how the conflicting medical opinions should be balanced. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). The ALJ provided a narrative discussion of the medical evidence, explained the weight he was giving to each of the medical opinions, and offered sound explanations for his decision. The Court cannot say the ALJ's analysis is not supported by substantial evidence, and the Court is not persuaded, on this record, that the ALJ improperly weighed the medical opinion evidence in this case.

### III.     The ALJ's Conclusion that Claimant's Allegations of Chronic Pain and Severe Limitations Were Not Supported by the Objective Medical Evidence Was Not Patently Wrong and Therefore Stands

Claimant next argues cursorily that the ALJ "cherry pick[ed]" evidence in coming to the "unsupportable" conclusion that Claimant's testimony was inconsistence with objective medical evidence. Plaintiff's Motion for Summary Judgment [ECF No. 9] at 13. For the following reasons, Court disagrees and finds the ALJ's sufficiently explained his assessment of Claimant's testimony that his assessment was supported by the record.

An ALJ must consider a claimant's own statements about his impairments and any pain he experiences. SSR 16-3p, which Claimant correctly notes was issued in March of 2016, establishes a two-step process for evaluating a claimant's subjective statements. See SSR 16-3p, 2017 WL 5180304 (October 25, 2017); 20 C.F.R. § 404.1529. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304,

at *3; 20 C.F.R. § 404.1529. Then, once an underlying "physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established," an ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities..." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 562 (7th Cir. 2009) (citations omitted); see also SSR 16-3p, 2017 WL 5180304, at *3; 20 C.F.R. § 404.1529(c). An ALJ's assessment is entitled to deference unless it is "patently wrong," *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015), which means "the decision lacks any explanation or support." *Murphy v. Colvin*, 759 F. 3d 811, 816 (7th Cir. 2014). In drawing conclusions about a claimant's credibility, "the ALJ must explain her decision in such a way that allows the court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Id.* An ALJ's credibility determination, or assessment of a Claimant's subjective testimony, is given deference because the ALJ is in a unique position to hear, see, and assess witnesses. *Id.* at 815.

An ALJ is not required to "discuss every snippet of information from the medical record that might be inconsistent" with the rest of the record. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Courts have also held that it is permissible for an ALJ "to examine all of the evidence including [a claimant's] daily activities, to assess whether" his alleged symptoms are exaggerated. Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016). Claimant characterizes only three specific pieces of evidence as "cherry picked" by the ALJ in order to support his conclusion. First, that the ALJ "dismissed [Claimant's] reports of intense discomfort because he was pleasant at an

examination;" second, that the ALJ "rejected an EMG that documented more than a few abnormalities and possible radiculopathy because of a lack of definitive results or abnormalities that did not show up at all;" and third, that the ALJ "improperly relied on 'conservative care' to undermine [Claimant's] allegations of pain." Plaintiff's Motion for Summary Judgment [ECF No. 9] at 13. In this case, the ALJ expressly discussed each of the three pieces of "contradictory" information flagged by Claimant above.

As to the first, the ALJ expressed doubt at the high pain level to which Claimant testified based on more than the fact that Claimant was pleasant at a single evaluation; rather, the ALJ formed this opinion because the medical evidence was replete with notations that Claimant was "in no acute distress" (R. 23, 426), experiencing no ongoing back pain (R. 23, 426), and that his back pain had only been present for two hours at the time he presented to the hospital in December of 2015. (R. 26, 532). The ALJ considered Claimant's statements and his complaints of pain in the context of the medical evidence and opinion evidence in the record and concluded that Claimant's "allegations of chronic pain and severe limitations are not supported by the objective medical evidence." (R. 22). In evaluating Claimant's statements and symptoms, the ALJ considered them in the context of Claimant's activities of daily living and the contradicting objective medical evidence, especially Dr. Nimmagadda's testimony. (R. 30). The Court cannot say the ALJ's analysis was not sufficient or not supported by substantial evidence.

Regarding Claimant's argument that the ALJ disregarded Claimant's EMG findings, in fact, the opposite is true. The ALJ engaged in a lengthy assessment of the what the EMG depicted and expressly acknowledged that certain findings in the EMG bolstered Claimant's case. (R. 250). Simply put, the ALJ did not ignore either Claimant's statements of pain or the EMG findings; he

merely did not take them at face value or conclude they undercut his conclusion as to whether Claimant was disabled before his date last insured.

While Claimant argues that the ALJ "improperly relied upon 'conservative care' to undermine [Claimant's] allegations of pain," the Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (upholding finding based in part on "relatively conservative" treatment); *see also Butler v. Astrue,* 2013 WL 660020, at *14 (N.D. Ill. Feb. 22, 2013) ("Courts have acknowledged that an ALJ can reasonably consider a claimant's conservative treatment history."). As the Commissioner correctly points out, no doctor ever recommended invasive treatment for Claimant, at least in the record before this Court. Plaintiff's Motion for Summary Judgment [ECF No. 9] at 14; Defendant's Response to Plaintiff's Motion for Summary Judgment [ECF No. 21] at 11. The ALJ cannot be said to have ignored the reasons Claimant chose "less invasive treatment options" where invasive treatment options never existed. Plaintiff's Motion for Summary Judgment [ECF No. 9] at 14.

## IV.    The RFC Accounted For All of Claimant's Mental Limitations, Including Those Related to Concentration, Persistence, or Pace

Claimant asserts that the ALJ failed to accommodate Claimant's limitations in concentration, persistence, or pace in determining the RFC, characterizing the ALJ's assessment as "perfunctory" and "arbitrar[y]." Plaintiff's Motion for Summary Judgment [ECF No. 9] at 14. Because the ALJ properly accommodated in his RFC Claimant's social anxiety and chronic pain – which were the basis for the finding that Claimant had a moderate limitation in concentration, persistence or pace – and provided the necessary detail to review his step three determination in a meaningful way, the Court finds the ALJ did not err in his formulation of the RFC here.

All of Claimant's limitations must be incorporated into the ALJ's RFC assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015*); Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

Specifically, the RFC must account for documented limitations of "concentration, persistence or pace." *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 739 (7th Cir. 2018)).

Although the ALJ questioned why Claimant had never pursued any psychological treatment or reported depression or anxiety to Dr. Lang, his self-described treating physician, the ALJ acknowledged that Claimant had been diagnosed previously with a social anxiety disorder. (R. 29). This anxiety disorder, together with Claimant's reports of "irritability due to chronic pain, social withdrawal, and difficulty getting along with others," led the ALJ to conclude that Claimant had moderate deficits in concentration, persistence, or pace. (R. 29). Relying on the state agency consultants, to whom the ALJ assigned substantial weight, the ALJ noted that Claimant would be able to "understand, remember, and carry out simple and detailed instructions but he would have difficulty persisting for a normal work period due to his medically determinable impairments." (R. 29). Claimant could, however, "make work related decisions and could interact and communicate sufficiently in a work environment with reduced social demands." (R. 29-30). Given that Claimant had been doing semi-skilled work as a companion to the elderly after his alleged disability onset date, and living with family, the ALJ discussed, but ultimately afforded little weight, to the state agency consultant's conclusion that Claimant was only capable of performing one to two step tasks in a work setting that did not involve routine interaction with others. (R. 29).

The ALJ accommodated Claimant's moderate limitations in concentration, persistence, or pace in the RFC by providing that "claimant can perform work that requires only simple decision

making, no public contact, and no more than occasional interaction with co-workers and supervisors." (R. 22). These accommodations clearly exclude the tasks that someone with Claimant's issues – namely social anxiety – could not perform. This is not a case where Claimant has any documented history of limited ability to concentrate: neither his medical records nor his diagnoses from his own treating physician, Dr. Lang, reveal any deficits whatsoever with respect to maintaining concentration. In fact, his psychological examination in 2013 documented "adequacy of attentional focus" and "adequacy for sustained concentration." (R. 458). Instead, the ALJ isolated Claimant's social anxiety and chronic pain as the source of Claimant's moderate limitations in concentration, persistence, or pace and appropriately tailored the RFC to that effect. (R. 30, 456-60). This finding is supported by Claimant's psychological consultative examination in November of 2013, in which the reviewing psychologists expressed their opinion that Claimant "retains the mental capacity to understand and remember simple and detailed instructions. The [Claimant] would have a moderate limitation persisting for a normal work period fur to MDI's. The [Claimant] could make work related decisions and could interact and communicate sufficiently in a work environment with reduced social demands. The [Claimant] could adapt to simple, routine changes and pressures." (R. 119). The ALJ used this support from the record and medical evidence to explain why he found that Plaintiff suffered only mild limitations of activities of daily living and moderate limitations in concentration, persistence, or pace.

## V. The ALJ Did Not Err in Concluding That Claimant Can Perform "Other" Available Work at Step Five

Claimant's last argument is also his most brief. Claimant states in three sentences, and without legal support, that the ALJ failed to meet his burden at step five because the VE did not provide the number of jobs for a particular region, rather than in the national economy, for the ALJ to consider. Plaintiff's Motion for Summary Judgment [ECF No. 9] at 14-15. However, the VE

complied fully with the guidelines in 20 C.F.R. § 404.1560(c)(2) at Claimant's hearing by providing evidence of 83,100 jobs that exist in significant numbers in the national economy that Claimant could perform. (R. 104-05). As the Social Security Administration has stated, "we consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. *It does not matter whether…work exists in the immediate area in which you live*." 20 C.F.R. § 404.1566 (emphasis added). Without any legal support or further argument from Claimant, which he notably declines to provide in his reply by simply inviting the Court to read his original Motion on this point, the Court finds this argument without merit. The ALJ therefore did not err in concluding that Claimant can perform "other" available work at step five based on the VE's testimony of jobs available in the national economy that Claimant could perform.

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, the ALJ's decision that Claimant is not disabled and not entitled to DIB and SSI is affirmed. Claimant's Motion for Summary Judgment [ECF No. 9] is denied and the Commissioner's Motion [ECF No. 21] is granted. The Clerk is directed to enter final judgment in favor of the Commissioner.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:    January 28, 2020